## FEINBERG v. GREAT SOUTHERN LIFE INS. CO.

### No. 3130.

Court of Civil Appeals of Texas. Beaumont.

Dec. 8, 1937.

Rehearing Denied Dec. 22, 1937.

Gordon, Lawhon, Sharfstein & Bell, of Beaumont, for appellant.

Vinson, Elkins, Weems & Francis, of Houston, Duff & Cecil and Lamar Cecil, all of Beaumont, and Simon Frank and Fred R. Switzer, both of Houston, for appellee.

WALKER, Chief Justice.

About 7:50 a. m., on the 25th day of August, 1933, in the city of Beaumont, Max Feinberg was run over by a freight train of the Beaumont, Sour Lake & Western Railway Company, and killed. At the time of his death he carried with appellee, Great Southern Life Insurance Company, a policy of life insurance, in full force and effect, for the sum of $25,000, payable to appellant, Mrs. Ida Feinberg, beneficiary; this policy called for "double indemnity" in the event the death of the insured resulted from bodily injury, etc., but expressly provided: "This agreement does not cover suicide, sane or insane, or any attempt thereat, sane or insane; nor death as a result of bodily injuries received while engaged in Military or Naval Service in time of war, or in aeronautics or submarine operations in time of peace or war; nor death resulting directly or indirectly from violation of law by the Insured."

On due proof of loss appellee paid the primary indemnity of $25,000, but refused to pay the "double indemnity" on these grounds: (a) The death of the insured was a suicide; (b) the insured was a trespasser on the property of the railroad company at the time of his death; (c) the insured was violating the law at the time of his death. When payment was refused appellant instituted this suit to recover the "double indemnity"; appellee answered, pleading in defense the provisions of the policy copied above. On trial to a jury, judgment was rendered in favor of appellee on an instructed verdict.

Pretermitting a discussion of the defenses of trespass and law violation, the evidence supports the verdict on the conclusion that the death of the insured was a suicide. All the testimony was to that effect, and there was not a scintilla of evidence to the contrary; nor was there a circumstance in the record impeaching the testimony of the eyewitnesses.

The railroad track crosses Fourth avenue about 800 feet west of the place where Mr. Feinberg was killed; he was killed near the intersection of the railroad tracks with Avenue C. We take the following statement from appellee's brief: "About 7:00 A. M. the morning of his death, three witnesses place him at Fourth Avenue on the north side of the railroad yards where the same crew was doing some switching. John McMurray, the fireman on the engine, described his actions as follows: 'When we were switching, that is making them fast moves, shifting the cars back and forth over where they were cutting cars at, he came up to the car; about the time he would get up to the cars we was stopped, and he would go right back to the same place. He would get very close.' J. D. Smith, the section foreman, described his actions as follows: 'He walked up there. At that time we thought he was trying to crawl through. When he walked up there, it seems like he wanted to get through the train and he acted like he was going to put his hands on the grip irons between the cars, and I would say he got in six inches of the train and then backed off.' Later, before the train of cars reached Avenue C, he was stationed at the telegraph pole on the west side of Avenue C, and north of the railroad track. There was nothing at that time to prevent him from crossing Avenue C to the south, on which side his automobile was located. He waited at his station near the telegraph pole till some of the freight cars had been pushed east across Avenue C, and then started walking east till he crossed over the roadway of Avenue C and on to the property of the Beaumont, Sour Lake & Western Railway Company. He then hastened his pace slightly, assumed a crouched or stooped position for a few steps, and then jumped or leaped under the train."

The witness, Pete Williams, testified:

"Q. Do you remember on August 25, 1933, seeing Mr. Feinberg around, Mr. Max Feinberg, around Avenue C where it crosses the Beaumont, Sour Lake & Western Railway Company? A. I seen him, but not knowing who he was.

"Q. You saw him, but you didn't know who he was at the time you first saw him? A. No, sir, I didn't know him.

"Q. Well, did you later see a man dead along the right of way of the Beaumont, Sour Lake & Western lying east of Avenue C? A. Yes, sir.

"Q. The man that you saw dead there, is he the same man that you have refer-

ence to seeing early in the morning? A. Yes, sir, it was the same man. * * *

"Q. Now then, where was this gentleman that you say you saw, this white gentleman you have described as Mr. Feinberg, where was he when you first saw him? A. When I first saw the gentleman he was down the track, down that way.

"Q. Which way? West? A. Well, west.

"Q. Towards Jones-O'Shaughnessy? A. Yes, sir.

"Q. Did you see him stop at any place there after you all got across? A. Well, he stopped at a post, one of those posts what those wires was on. He stopped there at one of them a few minutes.

"Q. Where were you when he was at the post? A. I was right there between those two—between where the Santa Fe goes in right there at the crossing on Avenue C.

"Q. Was there any switching going on across Avenue C about that time? A. Yes, sir, the switch engine had a long train switching.

"Q. Did you see the front end of that string of cars pushed over Avenue C? A. Did I see the front end?

"Q. Yes. A. Yes, sir.

"Q. The end that was going east? A. Yes, sir. They had slowed up there to throw a switch or something, a crossing or something, and they was switching east.

"Q. Now did Mr. Feinberg move after that train of cars moved across Avenue C? A. Yes, sir, he was walking up alongside of the cars.

"Q. Which way was he going? A. Going east.

"Q. Towards town or away from town? A. Towards town.

"Q. Now what was this train of cars doing as he walked across Avenue C? A. The cars was moving too.

"Q. Did he walk the same way the cars were being shoved? A. Yes, sir, they was shoving them east and he was walking east.

"Q. How far was he from those cars as they moved along going east? How far from them as he walked across there? A. Well, he was just like any other—just like a brakeman walking alongside the cars, about two feet and a half.

"Q. Do you know where that first switch stand is there east of Avenue C? Have you seen it; have you? A. Yes, sir.

"Q. Did he walk to that—along that train of cars until he got to that switch stand? A. Yes, sir.

"Q. Then what did he do? A. Well now, when he got to that switch stand he kind of looked around like this and he had his hand under the train. I couldn't see his hand. I don't know whether he had his hand hold of anything or not, but he went along that way with the train.

"Q. All right. Then what did he do? A. Then he made a jump.

"Q. He made a jump? A. And he cut that arm.

"Q. What did he do then when he made the jump? A. It cut one arm off. I forget which it was.

"Q. Wait a minute. When he jumped, which way did he— A. Under the train.

"Q. What did he do then? A. He hollered.

"Q. When did he holler? A. When he jumped under the train and cut one arm off and it knocked him from under there.

"Q. Now did the way the train hit him and the way he was knocked after the first jump, could you see him? A. Yes, sir, I seen him.

"Q. As it knocked him—when it knocked him out, which way did it knock him, out from the rails or under the rails? A. Out from the rails, and he set straight up.

"Q. He set straight up? A. Yes, sir.

"Q. Did he say anything more? A. Yes, sir, he hollered loud. He hollered, said 'Oh, Oh!' I was so frightened I wouldn't remember what he said, and this boy Dyle Singleton was closer to him than I was and he said—Dyle—he hollered and said, 'I will do it.'

"Q. Then after he hollered, was this train moving along east? A. Yes, sir, moving along east.

"Q. What did he do then? A. He leaped under there again. After he was sitting straight up out a distance from the rail, he leaped under there again.

"Q. What portion of his body did he put under it that time did it look to you like? A. Well, it looked to me like it caught him right along in there.

"Q. Right along the chest? A. Yes, sir, caught him right along in here."

On cross-examination:

"Q. Then after the train started there, he was still standing by this post, was he? A. After the train started?

"Q. Yes. A. Well, yes, sir, he was standing by the post and he stood there a little while.

"Q. What did he do? A. Well, when I seen him he had a cigarette, but he didn't stand there long.

"Q. Did you talk to him or speak to him? A. No, sir, I didn't speak to him at all.

"Q. Did anybody in the party speak to him? A. No, sir, not one of the boys what was with me didn't speak to him, and I didn't see anybody else out there.

"Q. You didn't see anybody else out there? A. No, sir, I didn't.

"Q. How long did he stand at the post, about? A. Well, when I seen him he had been standing there just about, seemed to me like about three minutes. He didn't stand there very long.

"Q. Now you say about the time he got up there to the post the train started? A. Yes, sir.

"Q. And during that three minutes how many of the cars went past the crossing? A. Now, I don't know, sir.

"Q. Any part of the train? A. Because I was down on this end and up ahead in there, I wasn't paying any attention to how many cars had crossed the crossing, but don't seem to me like nary one had crossed because they had stopped there to go on a switch.

"Q. You said the train started, though, about the time he got up there, is that right? A. Time he got up where, to the post?

"Q. To the post. A. Yes, sir.

"Q. And he stood there about three minutes, you think? A. Yes, sir.

"Q. Now after he left the post, was he still smoking there? A. No, sir, he wasn't smoking, I didn't see him smoke any.

"Q. Well, after he left the post. A. Seems to me after he left the post he throwed his cigarette down.

"Q. When he came up alongside the train there, he just walked up, did he? A. Ye was walking along, the train was moving slow, and he was just walking along. I thought he was a car inspector or railroad man or something. * * *

"Q. How far did he walk from the corner—I mean from the road down to the switch stand? A. From where the road crosses?

"Q. Yes. A. To the switch stand?

"Q. Yes. A. Well, that is about seventy feet, 70 or 75 feet.

"Q. He was walking slowly along there, was he? A. Yes, sir.

"Q. And walked down past the switch stand? A. Yes, sir.

"Q. Now as you saw him walking down there, was there anything about the way he walked that particularly attracted your attention or anything he did up to that point that attracted your attention to him? A. Yes, sir. I guess that is how come me to see him get under there. I always watch railroad men like that, switchmen or brakemens or anything like that, that make this switch, and turn that air, and he was acting to me as if he was some kind of employee of the railroad company or car knocker or something.

"Q. He did not act any different then than the average man you have seen walking alongside a railroad track? A. No, sir. I thought he was a railroad man. I thought he was a car inspector. I see them sometimes reach down, catch that air, and pull it, and I thought that was what he was going to do.

"Q. But you didn't see him reach to pull the air until you say he got down past the switch stand? A. No, sir, that is where he caught hold there after he had just passed that switch.

"Q. And he walked down there just like any other fellow does walking alongside a moving train? A. Yes, sir, until he went under.

"Q. Now you say that he kind of turned around? A. Yes, sir.

"Q. What did he do then? A. Well, when he kind of looked around like that, then he goes under there. Now I couldn't see his hands. That is why I thought he must have had some hold of something under there, I couldn't see his hands at all from where I was and I thought he must have had hold of something under there. That is when I thought he was going to pull air or something.

"Q. Up to that point he had been walking with his back toward you, hadn't he? A. Yes, sir.

"Q. Now when he went down, you say, under the train, towards the train, did he

go down slowly or fast or how? A. No, sir, just went down just like I just go down.

"Q. Kind of lurched forward? A. Yes, sir, and went down.

"Q. Kind of like a fellow does when he stumbles, he went rather fast? A. Well, I could just show you exactly how, but I couldn't hardly explain it here, but I could show you just exactly how he done because I was there and I was looking right at him.

"Q. All right, go ahead and show me. A. Now he was walking along just alongside the train like this and he kind of turned around and looked back like that, and then he got down like that, just like that, and all at once he went down, cut that arm off and knocked him out from under there." * * *

"Q. Then you say the train knocked him out there? A. Yes, sir, the box knocked him out from under it.

"Q. And when he came out there, you say you heard him holler? A. Yes, sir, he hollered before he made the second jump.

"Q. Then as the train knocked him away from the train— A. Yes, sir.

"Q. —he was in a sitting position then? A. He set up straight and looked around at that place where it had all that blood on it.

"Q. Then you say he stood up on his feet? A. No, sir, he didn't never get up on his feet.

"Q. He didn't get up on his feet? A. No, sir.

"Q. He just fell toward the train, is that it? A. Yes, sir.

"Q. Was that arm that was cut, was it cut clear off before he fell the second time? A. Well, if it wasn't, I couldn't see none of it.

"Q. You didn't see any of it. All you could see was just the stump, was that it? A. Just the blood and stump there, that is all I could see.

"Q. Then the second time he was in a sitting position and he just fell under the train? A. The second time when he came out, the second time when he made that holler, he made a leap and went under there and caught him along here, right along in here. * * *

"Q. Now would you say on your oath that he didn't fall there? A. Well, I

would say on my oath that he didn't fall that time. He leaped under there.

"Q. He leaped. That is the way it appeared to you? A. Yes, sir, that is the way it appeared to me.

"Q. You don't know whether he had stumbled before that time or not? A. No, sir, I don't know whether he stumbled or not. I am just talking about from the time I seen him.

"Q. You don't know whether he got a dizzy spell and started weaving with it? A. No, sir, I don't know.

"Q. All you are trying to say to the jury is you thought he leaped, is that it? A. Yes, sir.

"Q. That is all." * * *

Redirect Examination.

"By Mr. Switzer:

"Q. What makes you say he leaped under the train? What did he do to make you think he leaped under the train? A. Well, he done like that. See?

"Q. How did he do? A. He never did get up. He just done like that and the train caught him along here. That is why I say he leaped.

"Q. Did he use some exertion to get under there? Is that what you mean? Did he exert himself? Did he fall under or push himself under there? A. No, sir, he done just like I am showing you, just like that.

"Q. Before he jumped under that train the first time, did you see him? Did he walk straight along there? Was he walking ordinarily? A. Yes, sir. The first time he was walking steady, just like everyvody. I thought he was one of the train crew.

"Q. He didn't fall under there the first time, did he, when he walked along there? Did he fall under there the first time or did he jump under there? A. Well now, it is just like I showed it was. Do you want me to show you again?

"By Mr. Cecil:

"Q. Yes, come out and show us again. A. It was just this way and up behind there I couldn't see his arm, and all at once he made a lunge and he must not have went straight across there, he must have went kind of sideways for that car box to hit him and knock him out from under there, and that second time he leaped under there. That is just the way I seen it."

734

The witness, James Quinn, testified:

"Q. Now when your attention was first attracted to him, (Mr. Feinberg) what was he doing? A. He was smoking a cigarette. * * *

"Q. Did you see a switch stand, picture of a switch stand there on the east side of Avenue C? A. Yes, sir.

"Q. What did he do with reference to that switch stand? Where did he go with reference to it, east or west of it? A. Went east.

"Q. Did he do anything after he reached that switch stand going east? A. Yes, sir, he began to walk faster then. He was walking.

"Q. How far beyond that—how far east of that switch stand do you think he went, James? A. Not over three or four feet.

"Q. Then what did he do? A. Jumped under the train.

"Q. Did you see him there, James, as he moved towards the train? A. Yes, sir I saw him.

"Q. What did he do or what did you see he did? A. He got in a crouch and jumped under the train.

"Q. Could you see him? A. Yes, sir, I could see him.

"Q. About how far were you now from that post where you say you saw this gentleman the first time,· at the time he jumped under the train? A. I had walked nearly to that post then.

"Q. After he jumped under the train, as you have described, then what happened? A. The train knocked him back.

"Q. About how was he faced with reference to you when the train knocked him back? A. West.

"Q. And was it toward you or away from you? A. He was sort of facing me and the train.

"Q. Sort of facing you and the train? A. Yes, sir.

"Q. Did the cars move along there? A. Yes, sir, they was still moving.

"Q. While he was knocked back? A. Yes, sir, they was still moving.

"Q. Did you see him do anything else? A. Yes, sir.

"Q. What did he do? A. I saw him grab his arm.

"Q. All right, did you hear him say anything? A. No, sir.

"Q. Then you saw him grab his arm. What did he do then? A. Jumped back under the train.

"Q. Well, how was he after he was thrown out the first time? What position was he in when you saw him look at his arm? A. On his knees.

"Q. And how did he get under that train the second time? A. He jumped under there. * * *

"Q. When you saw him, and he was standing still? A. No, sir, he wasn't exactly standing still when I first saw him.

"Q. He was standing there, he was in that position was he, when you first saw him? A. Two or three feet of that post.

"Q. Smoking a cigarette? A. He taken a cigarette and lit it then and stood up there.

"Q. Now how far did you have to walk after saw him until you got to that crossing there? A. I could see him. I did not have to walk anywhere.

"Q. I say how far did you have to walk from where you first saw him up for you to get up to the crossing? A. Not over 200 feet.

"Q. Not over 200 feet. You were coming then alongside the train as it came in to that crossing, were you? A. The train had not got there.

"Q. Well, but the train passed you, did it, or not? A. Yes, sir, it passed me.

"Q. And you were walking along the left hand side of the track coming into Avenue C there? A. Yes, sir. I think it was the left side.

"Q. Were you on a path going through there? A. I don't think there was no path on that side.

"Q. What were you walking on? A. The bed right there, just in the grassy spots, you know, alongside the track.

"Q. On the same side of the track that this man was? A. Yes, sir.

"Q. And you had walked quite a distance alongside that side of the train down to the crossing at the time the accident occurred, hadn't you? A. Yes, sir. * * *

"Q. Now you say that you got up close to that pole when the man (Mr. Feinberg) started to walk away? A. When he started to walk away, I reckon I had done walked up in just about 100 feet of him.

"Q. Within about 100 feet of the pole, and how far was the pole from the switch stand? * * *

"Q. In your statement, James, didn't you say that the man was sitting down there? A. No, sir, I didn't.

"Q. You didn't say that? What did you say? A. I said he was on his hands and knees.

"Q. On his hands and knees? A. Yes, sir.

"Q. Now how did he get on his hands and knees? A. After he jumped under the train, but he didn't get on his hands and knees before he jumped under the train.

"Q. He didn't get on his hands and knees before? A. No, sir.

"Q. Now he was walking with his back toward you down there and he was near the switch stand? A. Yes, sir.

"Q. He was standing up when he passed the switch stand, standing up straight? A. No, sir, like he was looking for something under there or something. After he crossed, you see, he got in a stoop after he crossed the switch stand.

"Q. He got in a stoop after he crossed the switch stand. Now did he get in that stoop rather quickly or did he just go down slowly? A. Between that as he peartened his gait up, you see.

"Q. What? A. As he walked faster he bowed lower until he got even with the train.

"Q. He just picked up speed and the faster he went the more he sloped over, is that it? A. Yes, sir.

"Q. And when he got up to the train, did you see his hands? A. Yes, sir, I saw his hands.

"Q. Did he take hold of the train? A. No, sir.

"Q. Did his hands go under the train? A. I think his right arm did, I think.

"Q. What happened to his left one? A. Didn't anything happen to his left one then.

"Q. Were his hands in front of him or down at his side or where? A. They wasn't much far in front of him.

"Q. Wasn't much in front of him? A. No, sir.

"Q. How far was it from the time he started to stop until he actually got under the train, how far did he go there? A. Not over three or four feet.

"Q. Not over three or four feet? A. No, sir.

"Q. And when he went down the first time, his whole body didn't go under the train, did it? A. No, sir.

"Q. The train kind of knocked him out there? A. Yes, sir.

"Q. What did it do to him when he went under the first time? A. I think it cut his right arm off or mashed it.

"Q. Could you see it? A. Yes, sir.

"Q. And that would be the arm on the side next to the train as he walked along there? A. Yes, sir.

"Q. And it knocked him off his feet? A. Just about the time he jumped under the train, he was off his feet.

"Q. He was off his feet. Well, when the train hit him, what position did he remain in? A. He was on his knees.

"Q. On his knees? A. Yes, sir.

"Q. Then did he just crawl on under the train? A. You mean when he jumped under the second time?

"Q. Yes. A. No, sir, he kind of pitched himself like he jumped, you know, on his knees.

"Q. Got back on his feet? A. No, sir, he never did get back on his feet.

"Q. Did he crawl under then? A. No, sir, he didn't crawl under there.

"Q. Well, did the train knock him? How far did the train knock him back from the rail? A. About a foot and a half, I reckon, or two feet.

"Q. About a foot and a half from the rail? A. About two feet. I wont say exactly.

"Q. And he just pitched himself while he was in a kneeling position and went under the train? A. Yes, sir. * * *

"Q. Could you tell from where you were whether the man had stumbled? A. Yes, sir, I could have told.

"Q. Were you watching him? A. Yes, sir, I was watching him.

"Q. Very closely? A. Yes, sir.

"Q. Could you tell from where you were whether he had had a dizzy spell or not? A. Yes, sir.

"Q. Did he or did he not? A. No, sir, he didn't have no dizzy spell.

"Q. You can tell that, can you? A. Yes, sir."

Under the testimony of these witnesses, we are forced to the conclusion that the death of the deceased was a suicide.

736

There is no merit in appellant's proposition that the statement of the witnesses that the deceased "jumped under the train" and "leaped under the train" constituted mere conclusions of the witnesses, and not fact statements.

Appellant offered testimony to the effect that, shortly before his death, the deceased received an injury to his head, causing him to suffer dizzy spells; she advances the proposition that, under the evidence, it was a question of fact for the jury whether the deceased voluntarily jumped under the train or fell under the train as a consequence of a dizzy spell. The testimony was conclusively to the effect that the deceased on his own volition jumped under the train; the circumstances surrounding his death raised no inference that he fell under the train as a result of a dizzy spell.

The judgment of the lower court is affirmed.